380 A.2d 463

**Charles C. CAMPBELL,**

v.

**HOSTETTER FARMS, INC., Appellant.**

Superior Court of Pennsylvania.

Submitted March 14, 1977.

Decided Dec. 2, 1977.

Ronald J. Hagarman, Gettysburg, for appellant.

Samuel Kent Gates, York, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT, and SPAETH, JJ.

VAN der VOORT, Judge:

This action arises on a complaint in assumpsit for a failure to pay for 1,000 bushels of soybeans sold and delivered to appellant and a counterclaim by appellant for the partial failure of appellee to make deliveries on two contracts for the purchase of wheat and corn, respectively, and for the failure of appellee to pay for an order of seed wheat. Appellant is a dealer in grains with facilities at Hanover, Pennsylvania and appellee is a farmer who farms some 600 acres in the vicinity of Hanover. Appellee has obtained a judgment based upon a jury verdict in his favor for $7,500 which approximates the sum owing to him under the soybean contract after deducting his obligation to appellant for the seed wheat. The jury verdict has denied appellant any recovery on its counterclaim for damages growing out of appellee's shortfall in the delivery of wheat and corn. Appellant has appealed from the refusal of the trial court to grant a new trial.

The facts concerning the soybean and wheat seed transactions which form the basis of the judgment for appellee are undisputed. On July 21, 1973, the parties entered into an agreement evidenced by a written memorandum of purchase whereby appellee agreed to sell and appellant agreed to buy 1,000 bushels of soybeans at $7 a bushel, delivery to be made in October, November and December of 1973. Appellee raised on his farms and delivered 1,136⅔ bushels of soybeans within the agreed time period but appellant refused payment because of its asserted counterclaim based on a shortage of deliveries under the wheat and corn contracts and an unpaid bill for seed wheat. Aside from its counterclaims, appellant concedes its obligation to pay for the soybeans.

It is likewise undisputed that appellee purchased 65 bushels of Arthur seed wheat in the spring of 1973 for which he was appropriately billed $520 but that the bill had not been

paid. The jury verdict of $7,500 reflects the balance owing to appellee for soybeans after deducting his obligation to appellant for seed wheat.

There is partial agreement between the parties as to the terms of the wheat and corn contracts on which appellant bases its counterclaim. The parties agree that on May 7, 1973, they entered into an agreement for the sale by appellee and the purchase by appellant of 3,000 bushels of No. 2 wheat at $2.15 a bushel, delivery to be made in June and July of that year and that they signed a written memorandum to that effect. The parties likewise agreed that appellee delivered 1,534.88 bushels of wheat for which he was fully paid but that he failed to deliver the remaining 1,465.-12 bushels. The parties are in disagreement as to whether the failure to deliver was excusable because of unanticipated, abnormal farming conditions. Appellant claims damages of $1,814.36 but appellee denies liability.

The parties further agree that on May 8, 1973, appellee agreed to sell and appellant to buy 20,000 bushels of No. 2 yellow corn at $1.70 per bushel, delivery to be made in October and November of that year and that this agreement was also evidenced by a written memorandum. They agree that appellee delivered and was paid for 10,417.77 bushels of yellow corn but that he failed to deliver the balance of 9,582.23 bushels for which appellant claims damages of $11,-977.79. Again, the parties do not agree on whether the non-delivery was excusable or on the appellee's liability for damages.

Appellee sought to excuse his non-delivery of wheat and corn by evidence that an unduly wet season had resulted in a partial failure of his wheat crop and an inability to plant his normal acreage of corn because of wet ground. Appellant does not dispute the testimony of appellee that the crop yields on appellee's acreage were significantly below normal because of an unusually wet season. It contends, however, that appellee's contractual obligation was to deliver 3,000 bushels of No. 2 wheat and 20,000 bushels of No. 2 corn

without regard to the source from which such products were obtained.

The parties agree that as a preliminary to the sales contracts they met and discussed the number of acres that appellee planned to plant in both wheat and corn and were in agreement on the yield to be anticipated per acre, out of which came a calculation of acreage multiplied by yield per acre which resulted in the number of bushels stated in the memoranda of purchase signed by both parties at the conclusion of their discussions.

The sales agreements which grew out of these discussions were confirmed by so-called memoranda of purchase written on a printed form supplied by appellant. The memoranda are each a single page in length and were completed by appellant who inserted in the blank lines the commodity being purchased, the quantity, the price and the time of delivery. The quantity of wheat was expressed as 3,000 bushels and the corn as 20,000 bushels. Nothing was said about the source of the commodities being the farms of appellee. As to excuse for non-delivery there is printed language at the foot of each memoranda stating—

> "We do not accept any liability, save for our negligence, if commodity does not arrive according to billing instructions. We do not accept liability for shipping delays on account of strikes, embargoes, car shortages or other conditions beyond our control."

If this printed portion of the memoranda of purchase was intended to be applicable to these transactions it was for the benefit of appellee, the seller, because the abnormal conditions relate to acts of a seller, not a buyer.

While the parties are in agreement that the bushels to be purchased were calculated by estimating the probable yield of appellee's farms, they are in disagreement as to what was intended by the memoranda of purchase. Appellant interprets them as calling for bushels without regard to where obtained. Appellee reads the memoranda in the light of the conversations which preceded them and interprets the agreements to call for the yield from his farms, the bushels named

in the memoranda being jointly determined estimates of those yields. Appellee then argues that his non-delivery was excused because performance was made impracticable by the occurrence of weather and crop conditions contrary to the basic assumption on which the agreements were made.

Appellee justifies his right to explain the meaning of the contracts in the light of the conversations which preceded them by reliance upon Section 2–202(a) of the Uniform Commercial Code, 12A P.S. He excuses non-delivery by reliance upon Section 2–615 of the same Code.

■ Appellant challenges the right of the jury to interpret the agreements in the light of the course of dealings which preceded them, contending: (1) that the memoranda of agreements are too clear and unambiguous to permit parol evidence of the intended meaning of the parties; and (2) that if the negotiating background is to be considered, its effect upon the meaning of the agreements is to be determined by the court and not the jury. The latter issue was not presented to the court below either during the course of the trial or in appellant's enumeration to the trial court of its reasons for a new trial. The court left the issue to the jury under instructions which were not challenged:

Section 2–202 of the Code reads as follows:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be *explained or supplemented*

"(a) *by course of dealing* or usage of trade (Section 1–205) or by course of performance (Section 2–208); and

"(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." (Emphasis added)

Appellant's reliance is upon subsection (a) which authorizes parol evidence to explain a course of dealing. This term is defined in Section 1–205 of the Code as follows:

"(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

. . . . .

"(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

"(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

We conclude that it is not a prerequisite to the admissibility of testimony under Section 2–202 of the Code that the wording of the contracts be ambiguous. It is to be noted that there is no such requirement in the wording of the statute and this interpretation is reiterated in the official comment on the section by the Commissioners on Uniform State Laws who drafted the legislation. They state in their official comment—

"1. This section definitely rejects:

. . . . .

"(c) The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous.

"2. Paragraph (a) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating

the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used . . ."

It is said of the general philosophy of the Code in the commentary which appears in 12A P.S., pages XXXVII–VIII—

"Both in its generalized principles and in a considerable amount of its detail there is an effort to free the practices of merchants from legalisms and to establish a truly functional law merchant. The overriding principle and the constantly repeated theme is that of good faith, fair play and commercial reasonableness. Custom, trade usages and course of dealing are accentuated to give them a more pronounced effect. These fundamentals express the dual objective of reuniting the law and business and keeping them in step under changed circumstances."

Neither is it a correct interpretation of the Code that the court rather than a jury must determine the effect of such testimony upon the meaning of the contract. No such requirement is found in Section 2–202(a) or Section 1–205(1), (3).

By way of distinction, if a usage of trade is imbedded in a *written* trade code or similar writing the interpretation of the writing would be for the court (Section 1–205). Likewise, evidence of consistent additional terms may be excluded by the court if it determines that the written contract had been intended as a complete and exclusive statement of the agreement (Section 2–202(b)). We are not concerned with a written Code or usage or adding additional terms to a contract. We are simply dealing with the proffered explanation that 3,000 bushels of wheat and 20,000 bushels of corn was a shorthand way of stating the estimated yield of appellee's farms.

■ If the contract was intended to apply to the estimated yield of appellee's farms, his partial failure of delivery was excusable under Section 2–615 of the Code if the jury found that the shortfall in deliveries resulted from unseasonably wet weather contrary to the basic assumption on which the contracts were made. Section 2–615 of the Code provides as follows:

"Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or [Enrolled bill read 'on'.] non-delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer."

Furthermore it is stated in the Commissioners' note 9 to this section:

"9. The case of a farmer who has contracted to sell crops to be grown on designated land may be regarded as falling either within the section on casualty to identified goods or this section, and he may be excused, when there

is a failure of the specific crop, either on the basis of the destruction of identified goods or because of the failure of a basic assumption of the contract."

Appellee introduced evidence to this effect with respect to both wheat and corn yields on his farms. He testified that he gave notice to appellant of his inability to deliver and that he kept 2,000 bushels of corn to feed to his own stock. Appellant contended that such testimony was irrelevant, but did not otherwise challenge it. The court left it to the jury to determine whether notice had been given seasonably and whether the allocation of corn to appellee's own needs was an equitable allocation. See Section 2–615(b), (c) of the Code.

The appellant does not challenge, before us, the charge to the jury. The jury by and large accepted appellee's interpretation of the agreements and his testimony of weather conditions which made complete performance impossible. This they were entitled to do and we find no basis for awarding a new trial.

The appellant filed a motion for judgment n. o. v. The record is unclear whether the defendant reserved a point for binding instructions. It appears to us that no such timely motion was filed and that therefore consideration of a motion for judgment n. o. v., cannot be properly considered. Moreover, the appellant does not argue in his brief concerning any motion for judgment n. o. v. For these reasons, we will not consider such motion.

Affirmed.

SPAETH, J., files a concurring opinion in which JACOBS and HOFFMAN, JJ., join.

SPAETH, Judge, concurring:

I agree with the result reached by the majority, but I find the issues presented different from those discussed by the majority.

Appellee (seller) did not deliver to appellant (buyer) the amount of grain specified in the written contracts; he did

not because wet weather and other circumstances prevented him from growing enough grain to deliver the specified amount. However, pointing to oral negotiations, appellee reads the contracts as calling only for delivery of whatever amount of grain he grew. Appellant reads the contracts as requiring delivery of the specified amount of grain, from whatever source.

Appellant argues that parol evidence of the oral negotiations should not have been admitted. As I read appellant's brief, its argument is this: It was error for the trial judge not to have decided, himself, whether the contracts were intended to be the "complete and exclusive statement of the terms of the agreement," Uniform Commercial Code, Act of Oct. 2, 1959, P.L. 1023, § 2, 12A P.S. § 2–202(b). If the judge had decided that the contracts were a complete and exclusive statement, no parol evidence of "consistent additional terms" would have been admissible. Instead of making this decision, the judge left it to the jury.

I agree with the majority that even so, parol evidence of course of dealing or usage of trade could have been admitted under Uniform Commercial Code § 2–202(a). However, appellee introduced no such evidence. Indeed, appellee has never invoked § 2–202(a). I therefore cannot join the majority's statement that "[a]ppellee justifies his right to explain the meaning of the contracts in the light of the conversations which preceded them by reliance upon Section 2–202(a) . . . ." Majority Opinion at 237. Since appellee has never invoked § 2–202(a), a decision by the trial judge that the written contracts were a complete and exclusive statement would have sufficed to bar any parol evidence of the oral negotiations.

Appellant is correct that this decision was for the judge, not the jury: under § 2–202(b) written terms may be supplemented "unless *the court* finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement" (emphasis supplied). However, appellant has waived this argument, for he never made it below, instead allowing the jury to decide the question. I

agree with the lower court that there was ample evidence in support of the jury's verdict.

JACOBS and HOFFMAN, JJ., join in this opinion.